UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CASEY TROYER, as an individual and on behalf of all similarly situated employees,<br><br>　　　　Plaintiff,<br><br>　v.<br><br>THE YERBA MATE CO., LLC, and GUAYAKI SUSTAINABLE RAINFOREST PRODUCTS, INC.,<br><br>　　　　Defendants. | No. 20-06065-WHA<br><br>**ORDER RE MOTION TO CERTIFY CLASS** |

**INTRODUCTION**

In this wage-and-hour action, plaintiff alleges defendant misclassified his position as exempt from California's general overtime and meal and rest break rules under the outside salesperson exemption. Plaintiff seeks to certify a class of former and current employees in the same position classified as exempt outside salespersons. For the reasons that follow, a class of employees like plaintiff classified as exempt outside salespersons during the class period is **CERTIFIED**. Certification of the underlying wage-and-hour claims is **HELD IN ABEYANCE**. Certification of the unlawful recording claim is **DENIED**.

**STATEMENT**

At all material times, defendant Guayaki Sustainable Rainforest Products, Inc., made yerba mate tea beverages. Defendant The Yerba Mate Co., LLC, was the primary distributor

of the yerba mate beverages in California. Defendant Yerba Mate sold and distributed the drinks to a variety of retailers, including large chain supermarkets and grocery stores, chain convenience stores, and small, independent stores, and institutions like colleges and universities. Plaintiff Casey Troyer worked for defendant Yerba Mate as a "hacedor"[*] from December 2019 to August 2020. Yerba Mate uniformly classified plaintiff's position as an "outside salesperson," exempt from California's usual rest and meal break and overtime rules.

As a hacedor, plaintiff distributed the yerba mate drinks to defendant's retail customers using a company vehicle. Each workday, plaintiff retrieved the drinks from defendant's warehouse and loaded them into the company vehicle. A team of Yerba Mate employees based in Jacksonville, Florida, determined plaintiff's daily sales route using an application made by third-party Encompass Technologies Development, LLC. Plaintiff used the Encompass app on his smartphone to view his daily sales route. The daily route information included a list of customers, the number of stops, and each customer's purchase history, which plaintiff could use to gauge how many beverages he would need for the day.

At each stop, plaintiff contacted the retailer representative responsible for making purchases of the drinks. Plaintiff recorded the details of the sale, if any, in the Encompass app. The number of drinks plaintiff sold varied from retailer to retailer and visit to visit; however, plaintiff did not have authority to vary the price, except to make promotional offers of free drinks. After confirming the sale, plaintiff unloaded the drinks from the vehicle and moved them into the customer's store. Plaintiff also made deliveries to retailers who had pre-ordered drinks prior to delivery; in those circumstances, plaintiff made no sale. Some retailers required plaintiff to "merchandise" the drinks, *i.e.*, remove the packaging and arrange the drinks on the display shelf in an aesthetically pleasing display, ready to be sold to the consumer. After he completed his route, plaintiff would deposit the day's earnings in defendant's bank account.

Throughout his workday, the Encompass app recorded plaintiff's activities. Each time plaintiff logged onto the app, viewed a customer's information, arrived at a customer stop, or

---

[*] "Hacedor" is Spanish for "doer." The plural of hacedor is "hacedores."

2

edited an invoice (which were stored in the app), the Encompass app recorded the date, time, location, and the customer identity associated with the activity (Dkt. No. 50-7; O'Neil Dep. 112:22–113:18).

Plaintiff's duties also included team meetings, unloading cases of the drinks from a truck into the warehouse, delivering or receiving drinks to or from another hacedor, and cleaning and charging defendant's electric delivery vehicle.

Defendant paid plaintiff a flat salary of about $1,346.00 every two weeks: $16.83/hour times 80 hours compensable time per pay period. Plaintiff's pay did not vary with time worked and defendant did not pay overtime or commissions.

Plaintiff alleges that he frequently worked more than eight hours a day without meal or rest breaks. He alleges that although defendant did not expressly forbid him from taking breaks, defendant required plaintiff to complete his daily routes or risk termination; plaintiff alleges that he could not complete the routes on time if he took a meal or rest break.

Plaintiff alleges violations of California's rest and meal break rules, Cal. Lab. Code Sections 226.7 and 512, overtime compensation, Sections 510 and 1194, and derivative claims for wage statement and waiting time penalties, Sections 201, 202, 203, and 226. In addition, plaintiff alleges that defendant unlawfully recorded a confidential conversation he had with several co-workers at defendant's warehouse early in the morning, in violation of California Penal Code Section 632.

In the instant motion, plaintiff seeks to certify a class of "delivery driver 'hacedores' who worked in California and who were classified by Defendants as exempt from overtime during the period from April 6, 2016, to the present" and several subclasses (Dkt. No. 49 at 2). This order follows full briefing and a hearing held telephonically.

For the following reasons, this order will **CERTIFY** the following class: Delivery driver hacedores like plaintiff classified as exempt from overtime under California's outside salesperson exemption from April 6, 2016 to July 21, 2020.

For now, certification applies solely to the classification question. We will revisit possible certification of the underlying wage-and-hour claims after we hold a trial on the

3

classification issue. At that point, the Court will be better-informed to process the multitudinous and bone-crushing details of how plaintiff might establish class-wide overtime damages. Accordingly, the motion to certify a class as to the meal period, rest break, overtime, wage statement, and waiting time claims shall be **HELD IN ABEYANCE**.

The motion to certify the unlawful recording claim is **DENIED**.

**ANALYSIS**

Certification of a class action is governed by Federal Rule of Civil Procedure 23. The plaintiff must show that the proposed class action satisfies each of the four prerequisites of Rule 23(a) and one of the three requirements of Rule 23(b). Rule 23(a) requires the plaintiff to show:

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

In addition, plaintiff here seeks certification under Rule 23(b)(3), which requires him to show that:

> the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

A district court is required to do a rigorous analysis to determine if the requirements of Rule 23 are satisfied. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350–51 (2011). "Frequently that rigorous analysis will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped. The class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Id.* at 351 (cleaned up).

### 1. THE OUTSIDE SALESPERSON EXEMPTION.

Under California law, employees who are "outside salespersons" are exempt from the general meal and rest break and overtime protections. Cal. Lab. Code §§ 226.7(e), 1171. An "outside salesperson" is an employee who

> customarily and regularly works more than half the working time away from the employer's place of business selling tangible or intangible items or obtaining orders or contracts for products, services or use of facilities.

Cal. Indus. Welf. Com'n Wage Order 7-2001, § 2(J), *codified at* Cal. Code Regs. tit. 8, § 11070.

The California Division of Labor Standards Enforcement, the state agency charged with enforcing the wage orders, has explained the rationale behind the exemption:

> Outside salesman have historically been exempt because it's very difficult to control their hours and working conditions. They set their own time, and they're on the road, they call on their customers. Rarely do you know what they're doing on an hour-to-hour basis.

Cal. Div. of Lab. Stands. Enf't, Opinion Letter on Applicability of Outside Salesperson Exemption to Tract Homes Salespersons (Sep. 8, 1998), available at https://www.dir.ca.gov/dlse/opinions/1998-09-08.pdf.

The Tenth Circuit has similarly explained:

> The reasons for excluding an outside salesman are fairly apparent. Such salesman, to a great extent, work individually. There are no restrictions respecting the time he shall work and he can earn as much or as little, within the range of his ability, as his ambition dictates. In lieu of overtime, he ordinarily receives commissions as extra compensation. He works away from his employer's place of business, is not subject to the personal supervision of his employer, and his employer has no way of knowing the number of hours he works per day. To apply hourly standards primarily devised for an employee on a fixed hourly wage is incompatible with the individual character of the work of an outside salesman.

*Jewel Tea Co. v. Williams*, 118 F.2d 202, 207–08 (10th Cir. 1941).

In *Ramirez v. Yosemite Water Co., Inc.*, 20 Cal. 4th 785 (1999), a case involving very similar facts, the California Supreme Court set forth the authoritative construction of the state outside salesperson exemption. The *Ramirez* decision contrasted the state exemption with the federal counterpart, and described the relevant inquiry:

> [T]he federal exemption focuses on defining the employee's "primary function," not on how much work time is spent selling. Although the federal exemption does place a 20 percent cap on nonexempt (i.e., nonsales) work, that cap does not apply to any nonsales activities that are "incidental" to outside sales, including the making of deliveries. In other words, so long as it can be shown that the individual's chief duty or primary function is making sales, then every activity in any way incidental to sales may be funneled into the exempt category and excluded from the 20 percent cap on nonexempt work.
>
> Wage Order No. 7-80, on the other hand, makes no mention of the primary function for which the person is employed. Rather, the state regulation takes a purely quantitative approach, focusing exclusively on whether the individual "works more than half the working time . . . selling . . . or obtaining orders or contracts." State law also differs from the federal regulation in that it does not contain any provision that reclassifies intrinsically nonexempt nonsales work as exempt based on the fact that it is *incidental* to sales. The language of the state exemption only encompasses work directly involved in "selling . . . items or obtaining orders or contracts."
>
> \*   \*   \*
>
> Having recognized California's distinctive quantitative approach to determining which employees are outside salespersons, we must then address an issue implicitly raised by the parties . . . Is the number of hours worked in sales-related activities to be determined by the number of hours that the employer, according to its job description or its estimate, claims the employee *should* be working in sales, or should it be determined by the actual average hours the employee spent on sales activity? The logic inherent in the IWC's quantitative definition of outside salesperson dictates that neither alternative would be wholly satisfactory. On the one hand, if hours worked on sales were determined through an employer's job description, then the employer could make an employee exempt from overtime laws solely by fashioning an idealized job description that had little basis in reality. On the other hand, an employee who is supposed to be engaged in sales activities during most of his working hours and falls below the 50 percent mark due to his own substandard performance should not thereby be able to evade a valid exemption. A trial court, in determining whether the employee is an outside salesperson, must steer clear of these two pitfalls by inquiring into the *realistic* requirements of the job. In so doing, the court should consider, first and foremost, how the employee actually spends his or her time. But the trial court should also consider whether the employee's practice diverges from the employer's realistic expectations, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic given the actual overall requirements of the job.

*Id.* 797, 801–02 (1999) (citations omitted).

6

### A. NUMEROSITY.

The class is delivery driver hacedores like plaintiff classified as exempt from overtime under California's outside salesperson exemption from April 6, 2016 to July 21, 2020. The class likely exceeds at least 190 individuals (*see* Mosley Dep. at 129:1–4). Numerosity is satisfied.

### B. COMMONALITY.

The commonality element requires that there be a common contention among all class members which is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).

Here, defendant relies on its classification of the hacedores as exempt outside salespersons as its affirmative defense to the putative class members' overtime claims. The correctness of the classification is necessarily central to the claims of each of the class members because it is the defining characteristic of the class.

Defendant does not argue that commonality is not satisfied.

### C. TYPICALITY.

To satisfy typicality, plaintiff must show that the "claims or defenses of the representative parties are typical of the claims or defenses of the class." FRCP 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Wolin v. Jaguar Land Rover N. Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010).

Here, plaintiff's defining contention is that defendant improperly classified him as an exempt outside salesperson. As noted, that is the defining contention of the class. Defendant relies on that classification to relieve it from the obligation it would otherwise have to pay the employees overtime. Defendant does not argue that plaintiff's claims are unique from the class or that defendant would have defenses unique to some class members. Typicality is satisfied.

7

### D. ADEQUACY.

The final requirement of Rule 23(a) requires that the representative party fairly and adequately protect the interests of the class. To satisfy that requirement, the representative plaintiff and counsel must not have any conflicts of interest with other class members and must prosecute the action vigorously on behalf of the class. *Staton v. Boeing Co.*, 327 F.3d 938, 957 (9th Cir. 2003).

Here, plaintiff's lead counsel has submitted a declaration describing his qualifications, including an undergraduate degree in economics, and extensive experience in wage and hour litigation, including serving as class counsel in numerous wage and hour cases (Dkt. No. 49-1). Two associates have assisted in the case and would also serve as class counsel.

Plaintiff's counsel have vigorously litigated this case thus far, including the instant motion, in support of which they deposed defendant's director of human resources and the director of operations for California, and the COO of third-party app provider, Encompass Technologies Development, LLC, in addition to 12 putative class members. Plaintiff's counsel have also retained two experts, Dr. Brian Kriegler, Ph.D. statistics, and Dr. William W. Roberts, Ph.D. economics, who have submitted reports about how classwide damages can be calculated in this case.

In addition, counsel Mark L. Webb is associate counsel for plaintiff. Counsel Webb is a former assistant united states attorney with significant experience prosecuting organized crime. In his private practice, he has "focused on personal injury and [he] was successful in obtaining a number of large verdicts" (Decl. of Webb at ¶ 2). Counsel Webb would assist Counsel Yoon in trying this case if it went to trial (Decl. of Webb at ¶ 4).

Plaintiff has submitted a declaration that he understands he would have duties to the class members as class representative to "put the interests of the Class before [his] own interests," to not "sell out the Class for [his] own personal gain," and to "always actively participate in the lawsuit" (Dkt. No. 49-3 at 361).

8

Defendant has pointed to no reason to believe that plaintiff's counsel have any conflict of interest with putative class members or that plaintiff and plaintiff's counsel would not vigorously prosecute this action on behalf of the proposed class; this order finds none.

Adequacy of representation is satisfied.

### E. RULE 23(b)(3).

To certify a class under Rule 23(b)(3), plaintiff must show "that the questions of law or fact common to the class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). "This analysis presumes that the existence of common issues of fact or law have been established pursuant to Rule 23(a)(2); thus, the presence of commonality alone is not sufficient to fulfill Rule 23(b)(3). In contrast to Rule 23(a)(2), Rule 23(b)(3) focuses on the relationship between the common and individual issues." *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998).

Our court of appeals has held that while an employer's policy of uniformly classifying a group of employees as exempt outside salespersons is a relevant factor to the Rule 23(b)(3) analysis, "it is an abuse of discretion to rely on such policies to the near exclusion of other relevant factors touching on predominance." *In re Wells Fargo Home Mortg. Overtime Pay Litigation*, 571 F.3d 953, 955 (9th Cir. 2009).

Our court of appeals has also recognized, however, that class certification is appropriate where a plaintiff shows "(a) company-wide policies governing how employees spend their time, or (b) uniformity in work duties and experiences that diminish the need for individualized inquiry." *Vinole v. Countrywide Home Loans, Inc.*, 571 F.3d 935, 947 (9th Cir. 2009) (citation omitted).

### *(i)* *The Sales Routes Governed How the Hacedores Spent Their Time.*

The employees' jobs centered on their daily sales routes and their use of the route accounting tool, the Encompass app. A team of Yerba Mate employees in Florida designed the hacedores' daily sales routes using the app (Mosley Dep. at 92:18–93:4). Defendant designed the daily sales routes to be completed in eight hour shifts and to keep each hacedor within their specific, assigned areas (Mosley Dep. at 94:18–95:17). The daily sales routes served as the hacedores' schedules (Mosely Dep. at 92:4–5).

Each workday, the hacedores' accessed their route using the Encompass app (Mosley Dep. at 91:21–92:3; O'Neill Dep. at 75:4–6). The hacedores did not plan their daily sales routes (Mosley Dep. at 92:18–21). They could not add or remove stops without a supervisor's approval (O'Neill Dep. at 112:20–113:7). Defendant required the hacedores to follow their routes and complete every stop on the routes (O'Neill Dep. at 80:5–9). The Encompass app gave the hacedores driving directions (O'Neill Dep. at 94:5–10).

Importantly, the hacedores used the Encompass app for virtually every task and the app recorded detailed data about every significant task they did, for both their active use of the app, for example, creating and editing invoices, and passively, like arriving at a customer location. For example, each time an hacedor arrived at a customer location, viewed a customer record, or opened or closed an invoice, the app recorded the date, time, location, and the customer associated with the action (*see* Dkt. No. 50-7; O'Neil Dep. at 121:16–122:18, 124:13–125:2, 144:18–146:16). As an example, a spreadsheet showing one day's worth of that data is included in the appendix to this order.

In addition, the Encompass app recorded information about each invoice created by the employees, including the number of cases of drinks sold, the total sale, the customer, the date and time, and the route. Examples of that data are also included in the appendix to this order.

The same data is available for all class members (O'Neil Dep. at 82:11–86:7, 177:11–22).

### *(ii)* *The Hacedores Had Uniform Work Experiences and Duties.*

The common proof offered by plaintiff, including the hacedor job description and the depositions of defendant's director of operations for California, Nicholas O'Neill, and director of human resources, Jeanette Mosley, establish the following uniform work experiences:

- Defendant did not require applicants to have any previous sales experience (Dkt. No. 49-3 at 631–32).
- Defendant did not pay the hacedores commissions or bonuses (Mosley Dep. at 240:20–241:1, 118:5–9).
- Defendant paid a flat salary regardless of how many hours the hacedores worked or how many drinks they sold (Mosley Dep. at 149:12–151:4).
- Defendant did not do performance reviews (O'Neill Dep. at 124:5–125:10).
- The hacedores could not negotiate price with the retailers (O'Neill Dep. at 112:4–7).
- The hacedores could not negotiate contracts with the retailers (Mosley Dep. at 199:17–201:6; O'Neill Dep. at 208:13–19). Their only obligation with regard to obtaining contracts was to obtain the signature of the retailer's representative approving the instant sale (O'Neill Dep. at 208:13–19).
- Defendant's sales team established new chain-retailer accounts (Mosley Dep. at 198:8–14, 199:6–16; O'Neill Dep. at 61:6–12). The hacedores could not sell to a chain retailer before the sales team had established an account for that retailer (O'Neill Dep. at 203:2–204:15; Mosley Dep. at 199:12–16).

*Ramirez* instructed that in determining whether an employee "customarily and regularly work[ed] more than half the working time away from the employer's place of business selling," the most important question is: what are "the *realistic* requirements of the job"? 20

11

Cal. 4th at 802. That inquiry is informed in part by "the employer's realistic expectations," and "the actual overall requirements of the job." *Ibid.* "Considerations such as 'the employer's realistic expectations' and 'the actual overall requirements of the job' are likely to prove susceptible of common proof." *Sav-On Drug Stores, Inc. v. Superior Court*, 34 Cal. 4th 319, 337 (2004).

Here, the testimonies of the directors of operations and human resources show uniformity in work experiences among the class members and demonstrate that the realistic requirements of the job, defendant's realistic expectations, and the actual overall requirements of the job are susceptible of common proof.

Furthermore, the California Supreme Court has instructed that a trial court should "itemize the types of activities that it considers to be sales related, and the approximate average times that it finds the employee spent on each of these activities." *Ramirez*, 20 Cal. 4th at 803, n. 5.

This order finds that procedure to be especially useful here, where the employees performed "a reasonably definite and finite list" of tasks. *Sav-On Drug Stores*, 34 Cal. 4th at 331.

***Primary Duties:*** At the beginning of their shifts, the hacedores opened the Encompass app on their smartphones and synchronized their app with the Encompass server to access their sales route for the day (O'Neill Dep. at 75:4–13). The hacedores loaded their delivery vehicles with drinks at defendant's warehouse (O'Neill Dep. at 218:1–5, 224:1–22). The sales routes told the hacedores the historical sales for each retailer on the route so they knew how much product to load into their vehicles for the day (O'Neill Dep. at 77:10–78:6). The hacedores then followed their routes (O'Neill Dep. at 80:5–7). Defendant required the hacedores to complete every stop on their routes (*ibid.*). At each stop, the hacedores first checked-in with the "receiver," *i.e.*, the employee who had authority to buy the drinks on the retailer's behalf (O'Neill Dep. at 94:15–95:7, 97:3–8). The hacedorrd then surveyed Yerba Mate's assigned shelf space to see if the shelf needed to be restocked (O'Neill Dep. at 95:21–96:2, 97:21–98:5). If the retailer had "back stock," *i.e.*, drinks in the storage area of the store, the hacedores

restocked the shelf with the back stock (O'Neill Dep. at 99:9–19). The hacedores "merchandise[d]" the shelf, which meant throwing away the packaging and arranging the drinks in a neat display on the shelf for sale to the consumer (O'Neill Dep. at 106:4–11). "Ideally," or "hopefully," the hacedores then surveyed the rest of the store to find available shelf space or refrigerator space where the retailer might be willing to stock additional drinks (O'Neill Dep. at 96:1–5, 98:6–9).

The hacedores then went back to the receiver and made a recommendation to the receiver (O'Neill Dep. at 99:12–100:4). If the receiver approved a sale, the hacedores prepared an invoice in the Encompass app and a hard copy, the receiver signed the invoice, and the hacedores noted the receiver's signature in the Encompass app and kept the hard copy (O'Neill Dep. at 104:18–105:4). The hacedores unloaded the drinks from the delivery car and put them in the back stock or on the display shelf and, if applicable, merchandised the shelf (O'Neill Dep. at 106:4–11).

After completing the route, the hacedores deposited the cash and checks from the day's sales in defendant's bank account (O'Neill Dep. at 81:18–21).

As noted, the hacedores constantly used the Encompass app, pressing the "sync" button to synchronize their local app to the server, for driving directions, creating and editing invoices, and more.

*Secondary Duties:* The hacedoors' secondary duties included cleaning and charging the electric delivery vehicles, helping their fellow hacedores complete their routes by completing one of their stops, and warehouse work, like cleaning and organizing the warehouse (O'Neill Dep. at 82:11–19, 93:4–6, 137:6–19, 139:6–17; Dkt. No. 49-3 at 631).

Thus, plaintiff has shown both "facts regarding (a) company-wide policies governing how employees spen[t] their time, [and] (b) uniformity in work duties and experiences that diminish the need for individualized inquiry." *Vinole*, 571 F.3d at 947.

### (iii) Defendant's Arguments Are Unpersuasive.

Defendant does not contest that the sales routes it designed for the hacedores governed how they spent their time or that they had uniform work duties. Instead, defendant primarily

13

argues that the amount of time the hacedores spent on different tasks varied significantly from hacedor to hacedor and from stop to stop. Defendant has submitted declarations from several current employees showing that among the declarants, for example, the time it takes to prepare an invoice and collect payment varies from five minutes to thirty-five minutes and unloading the drinks from the delivery vehicle varies from one or two minutes to thirty minutes (Dkt. No. 52 at 15). Thus, defendant argues, assuming some of those tasks qualify as sales-related tasks, the amount of time each hacedor spent on sales-related tasks may vary significantly.

That argument is unpersuasive for two reasons, one factual, one legal. *First*, defendant overstates the significance of the fact that different hacedores spent different amounts of time on the same tasks depending on the hacedor and depending on the route. Defendant points to variation in the number of stops, the number of pre-order stops, how many customers required the hacedores to restock, and variability in how much time it took them to complete the same tasks, such as restocking or preparing an invoice. But defendant's declarants confirm that the tasks themselves are the same, as described by defendant's director of operations. In addition, it is undisputed that defendant designed the hacedores' sales routes to be completed in about eight hours (*see* O'Neill Dep. at 137:10–19, 142:11–16; *see also* Mosley Dep. at 94:18–22).

*Second*, defendant misunderstands the substantive test. *Ramirez* instructed:

> A trial court, in determining whether the employee is an outside salesperson, must steer clear of these two pitfalls by inquiring into the *realistic* requirements of the job. *In so doing*, the court should consider, first and foremost, how the employee actually spends his or her time. *But the trial court should also consider . . . the employer's realistic expectations*, whether there was any concrete expression of employer displeasure over an employee's substandard performance, and whether these expressions were themselves realistic *given the actual overall requirements of the job*.

20 Cal. 4th at 802 (latter emphases added). In other words, the ultimate question is: What are the *realistic* requirements of the job? How the employee actually spent his or her time is, perhaps, the most probative indicator of the realistic requirements. But the employer's realistic expectations and the actual overall requirements of the job are also relevant, and those factors are susceptible of common proof here because the hacedores had uniform work duties and

14

experiences and because defendant had a uniform policy controlling how the hacedores spent their time.

In addition, the robust data collected by the Encompass app will allow us to find easily the numbers of hours spent on each task on an individual by individual basis and if some class members have too few hours on non-exempt tasks, they will lose while others will win. We can sort the winners in the class from the losers via a common method of proof, thanks to the app.

### 2. THE UNLAWFUL RECORDING CLAIM.

Section 632(a) of California's Penal Code prohibits "intentionally, and without the consent of all parties to a confidential communication, us[ing] an electronic amplifying or recording device to eavesdrop upon or record the confidential communication."

A conversation is confidential under Section 632(a) "if a party to that conversation has an objectively reasonable expectation that the conversation is not being overheard or recorded." *Flanagan v. Flanagan*, 27 Cal. 4th 766, 776–77 (2002).

Whether a person had an objectively reasonable belief that her conversation would not be recorded requires "individualized proof" of the specific circumstances of the conversation. *See Hataishi v. First American Home Buyers Protection Corp.*, 223 Cal.App.4th 1454, 1467 (2014).

Plaintiff argues his Section 632(a) claim is amenable to class-wide adjudication because defendant never obtained consent from the class members to record their conversations in the warehouses. Plaintiff misplaces emphasis on the lack of consent. While lack of consent to be recorded is necessary to state a claim under Section 632(a), it is not by itself sufficient. Instead, plaintiff must show that under the specific circumstances in which his conversation took place, he had an objectively reasonable expectation that the conversation was not being overheard or recorded. *See Kight v. CashCall, Inc.*, 200 Cal.App.4th 1377, 1396 (2011).

Factors affecting whether a hacedor had an objectively reasonable expectation that his conversation was not being overheard or recorded include how many other employees were present in the warehouse at the time of the conversation; the number of participants in the

15

conversation; how loudly the employee was speaking; or whether the hacedor had some reason to suspect that the cameras in the warehouse also recorded audio. Plaintiff has not shown that the Section 632(a) claim is susceptible of class-wide adjudication.

## CONCLUSION

Therefore, a class of delivery driver hacedores like plaintiff classified as exempt from overtime under California's outside salesperson exemption from April 6, 2016 to July 21, 2020 is **CERTIFIED**. For now, certification applies solely to the classification question. Certification of the underlying wage-and-hour claims is **HELD IN ABEYANCE**.

Certification of the unlawful recording claim is **DENIED**.

Plaintiff Casey Troyer is **APPOINTED** representative of the class.

Yoon Law, APC is **APPOINTED** counsel for the class.

**WITHIN TWO WEEKS OF THIS ORDER**, the parties shall file a joint proposed class notice together with a plan of distribution and timeline for opt out. The proposed notice should conform to Rule 23(c)(2)(B).

**IT IS SO ORDERED.**

Dated: June 29, 2021

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

## APPENDIX

## PLAINTIFF TIME CLOCK EVENTS 2/6/2020

| # | Time Clock Activity | Time Clock Shift | Date | User | Customer | Start Time | End Time | Latitude | Longitude |
|---|---|---|---|---|---|---|---|---|---|
| 1 | Time Clock Events Sample - Bates no. DefsProd-000974 | | | | | | | | |
| 550 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | 100533 Target #1427 | 2/6/2020 4:34 AM | 2/6/2020 6:06 AM | 37.2916361 | -121.9382261 |
| 554 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | 100533 Target #1427 | 2/6/2020 6:06 AM | 2/6/2020 6:37 AM | 37.3239132 | -122.0402429 |
| 555 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 100533 Target #1427 | 2/6/2020 6:37 AM | 2/6/2020 6:37 AM | 37.2908352 | -121.9895961 |
| 556 | At Customers Location | 141169 | 2/6/2020 | Casey Troyer | 100533 Target #1427 | 2/6/2020 6:37 AM | 2/6/2020 6:37 AM | 37.2908352 | -121.9895961 |
| 557 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 100533 Target #1427 | 2/6/2020 6:37 AM | 2/6/2020 6:37 AM | 37.2908352 | -121.9895961 |
| 562 | At Customers Location | 141169 | 2/6/2020 | Casey Troyer | 100533 Target #1427 | 2/6/2020 7:13 AM | 2/6/2020 7:13 AM | 37.2905176 | -121.9895548 |
| 563 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 100533 Target #1427 | 2/6/2020 7:13 AM | 2/6/2020 7:13 AM | 37.2905176 | -121.9895548 |
| 564 | At Customers Location | 141169 | 2/6/2020 | Casey Troyer | 100533 Target #1427 | 2/6/2020 7:13 AM | 2/6/2020 7:13 AM | 37.2905176 | -121.9895548 |
| 565 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 100533 Target #1427 | 2/6/2020 7:13 AM | 2/6/2020 7:47 AM | 37.2905176 | -121.9895548 |
| 569 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | 142521 Whole Foods Market #10005 | 2/6/2020 7:47 AM | 2/6/2020 8:07 AM | 37.4174521 | -122.097519 |
| 570 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 142521 Whole Foods Market #10005 | 2/6/2020 8:07 AM | 2/6/2020 8:07 AM | 37.4174521 | -122.097519 |
| 571 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | 142521 Whole Foods Market #10005 | 2/6/2020 8:07 AM | 2/6/2020 8:07 AM | 37.4174521 | -122.097519 |
| 572 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 142521 Whole Foods Market #10005 | 2/6/2020 8:07 AM | 2/6/2020 8:30 AM | 37.4174521 | -122.097519 |
| 573 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 142521 Whole Foods Market #10005 | 2/6/2020 8:30 AM | 2/6/2020 8:40 AM | 37.4422975 | -122.1596862 |
| 576 | At Customers Location | 141169 | 2/6/2020 | Casey Troyer | 142807 Whole Foods Market #10154 | 2/6/2020 9:25 AM | 2/6/2020 9:25 AM | 37.4827959 | -122.2318486 |
| 577 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 142807 Whole Foods Market #10154 | 2/6/2020 9:25 AM | 2/6/2020 9:25 AM | 37.4827959 | -122.2318486 |
| 578 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 142807 Whole Foods Market #10154 | 2/6/2020 9:25 AM | 2/6/2020 9:41 AM | 37.4827959 | -122.2318486 |
| 579 | At Customers Location | 141169 | 2/6/2020 | Casey Troyer | 142807 Whole Foods Market #10154 | 2/6/2020 9:25 AM | 2/6/2020 9:25 AM | 37.4827959 | -122.2318486 |
| 583 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | | 2/6/2020 9:49 AM | 2/6/2020 9:50 AM | 37.4822103 | -122.2317722 |
| 587 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | | 2/6/2020 9:50 AM | 2/6/2020 10:50 AM | 37.4822103 | -122.2317722 |
| 591 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | 4729 Mollie Stone's Markets/Bayhill Store #5 | 2/6/2020 10:50 AM | 2/6/2020 11:40 AM | 37.4176206 | -122.0974533 |
| 592 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 4729 Mollie Stone's Markets/Bayhill Store #5 | 2/6/2020 11:40 AM | 2/6/2020 11:40 AM | 37.6265492 | -122.4271619 |
| 593 | At Customers Location | 141169 | 2/6/2020 | Casey Troyer | 4729 Mollie Stone's Markets/Bayhill Store #5 | 2/6/2020 11:40 AM | 2/6/2020 11:40 AM | 37.6265492 | -122.4271619 |
| 594 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 4729 Mollie Stone's Markets/Bayhill Store #5 | 2/6/2020 11:40 AM | 2/6/2020 11:47 AM | 37.6265492 | -122.4271619 |
| 597 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | 142632 Whole Foods Market #10150 | 2/6/2020 11:56 AM | 2/6/2020 12:30 PM | 37.6264247 | -122.4274284 |
| 598 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 142632 Whole Foods Market #10150 | 2/6/2020 12:30 PM | 2/6/2020 12:30 PM | 37.5437842 | -122.2917983 |
| 599 | At Customers Location | 141169 | 2/6/2020 | Casey Troyer | 142632 Whole Foods Market #10150 | 2/6/2020 12:30 PM | 2/6/2020 12:30 PM | 37.5437842 | -122.2917983 |
| 600 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 142632 Whole Foods Market #10150 | 2/6/2020 12:30 PM | 2/6/2020 12:34 PM | 37.5437842 | -122.2917983 |
| 602 | At Customers Location | 141169 | 2/6/2020 | Casey Troyer | 5224 Mollie Stone's Markets/San Mateo #7 # 5224 | 2/6/2020 12:39 PM | 2/6/2020 12:53 PM | 37.5444641 | -122.2913661 |
| 603 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 5224 Mollie Stone's Markets/San Mateo #7 # 5224 | 2/6/2020 12:53 PM | 2/6/2020 12:53 PM | 37.5444641 | -122.2913661 |
| 604 | At Customers Location | 141169 | 2/6/2020 | Casey Troyer | 5224 Mollie Stone's Markets/San Mateo #7 # 5224 | 2/6/2020 12:53 PM | 2/6/2020 12:53 PM | 37.5444641 | -122.2913661 |
| 605 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 5224 Mollie Stone's Markets/San Mateo #7 # 5224 | 2/6/2020 12:53 PM | 2/6/2020 12:57 PM | 37.5444641 | -122.2913661 |
| 608 | At Customers Location | 141169 | 2/6/2020 | Casey Troyer | 5224 Mollie Stone's Markets/San Mateo #7 # 5224 | 2/6/2020 1:27 PM | 2/6/2020 1:27 PM | 37.5293512 | -122.2894064 |
| 609 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 5224 Mollie Stone's Markets/San Mateo #7 # 5224 | 2/6/2020 1:27 PM | 2/6/2020 1:27 PM | 37.5293512 | -122.2894064 |
| 610 | At Customers Location | 141169 | 2/6/2020 | Casey Troyer | 5224 Mollie Stone's Markets/San Mateo #7 # 5224 | 2/6/2020 1:27 PM | 2/6/2020 1:27 PM | 37.5293512 | -122.2894064 |
| 611 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 5224 Mollie Stone's Markets/San Mateo #7 # 5224 | 2/6/2020 1:27 PM | 2/6/2020 1:30 PM | 37.5293512 | -122.2894064 |
| 614 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | | 2/6/2020 2:23 PM | 2/6/2020 2:25 PM | 37.2916555 | -121.9382574 |
| 620 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | 100533 Target #1427 | 2/6/2020 2:51 PM | 2/6/2020 2:51 PM | 37.2916883 | -121.9382302 |
| 621 | Order Entry | 141169 | 2/6/2020 | Casey Troyer | 100533 Target #1427 | 2/6/2020 2:51 PM | 2/6/2020 2:51 PM | 37.2916883 | -121.9382302 |
| 624 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | | 2/6/2020 2:52 PM | 2/6/2020 2:52 PM | 37.2916747 | -121.9382542 |
| 625 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | 100504 Target #1122 | 2/6/2020 2:52 PM | 2/6/2020 2:52 PM | 37.2916748 | -121.9382588 |
| 627 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | 142811 Whole Foods Market #10155 | 2/6/2020 2:53 PM | 2/6/2020 2:53 PM | 37.291674 | -121.9382581 |
| 629 | View Customer Information | 141169 | 2/6/2020 | Casey Troyer | 100504 Target #1122 | 2/6/2020 2:53 PM | 2/6/2020 2:53 PM | 37.2916727 | -121.9382595 |

Column G contains the activity. Column F contains the customer associated with the activity. Column G contains the date and start time for the activity. The start time is when plaintiff took the associated action on the Encompass app. For example, the start time for

view customer information is when the plaintiff opened "the customer record in the customer view screen" on the app (O'Neil Dep. at 124:13–19).

**PLAINTIFF LOAD SHEETS SAMPLE, 12/30/19–1/7/20**



This spreadsheet is a collection of five "load sheets," one for each workday, which contain information about plaintiff's sales routes for those days. Note: Each load sheet contains information about each invoice created that day, including the total cases sold in each

invoice and the sale price. The number of invoices created on a particular day does not necessarily correspond to the number of stops made because the driver may have made a stop without creating an invoice, *e.g.*, if no drinks were sold (O'Neill Dep. at 170:15–171:6). In addition, only those invoices with invoice numbers starting in "1831" were created by plaintiff (O'Neill Dep. at 187:13–20).

## PLAINTIFF LOAD SHEET HISTORY, 12/30/19–1/7/20

| | A | B | C | D | E | F | G | H | K | L | M | N | O | P |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | CONFIDENTIAL Troyer Load Sheet History DefsProd-000915 | | | | | | | | | | | | |
| 2 | Load Sheet ID | Date | Location | Route | Bin | Vehicle | Status | Warehouseman | Receipt Total | Invoice Total | Phone | Route Num | Plan ID | Invoice Count |
| 3 | 114946 | 12/30/2019 | NORCAL SOUTH: HAYWARD, CA | SB Ryan Monday | 4779 | Unassigned: Hayward | Verified | Casey Troyer | $0.00 | $204.12 | | 112812 | 110087 | 5 |
| 4 | | Invoices | | | | | | | | | | | | |
| 5 | | Customer | Invoice Num | | Debit | Credit | Open Balance | Total Cases | PO Num | Terms | Open Debit | Posted Applied Debit | Open Credit | Posted Applied Credit | Locked |
| 6 | | Chevron #92679 EM#5968 | 1061234 | | $90.40 | $0.00 | $0.00 | 4.00 | | Fintech Net30 | $0.00 | $90.40 | $0.00 | $0.00 | TRUE |
| 7 | | Default Load Hayward # 1458 | 1059509 | | $0.00 | $0.00 | $0.00 | 0.00 | | OD (Enforce After Sale) | $0.00 | $0.00 | $0.00 | $0.00 | FALSE |
| 8 | | Lucky 759 | 1831-00006 | | $49.20 | $0.00 | $0.00 | 2.00 | | NET 30 | $0.00 | $49.20 | $0.00 | $0.00 | TRUE |
| 9 | | Safeway #763 | 1831-00005 | | $22.60 | $0.00 | $0.00 | 1.00 | | NET 30 | $0.00 | $22.60 | $0.00 | $0.00 | TRUE |
| 10 | | Sprouts #269 | 1831-00002 | | $41.92 | $0.00 | $0.00 | 2.00 | | NET 30 | $0.00 | $41.92 | $0.00 | $0.00 | TRUE |
| 11 | | | 5 | | $204.12 | $0.00 | $0.00 | 9.00 | | | $0.00 | $0.00 | $0.00 | $0.00 | |
| 12 | 117726 | 1/2/2020 | NORCAL SOUTH: HAYWARD, CA | Hammond Mountain View 1 SB Thursday | 4787 | Unassigned: Hayward | Verified | Casey Troyer | $0.00 | $484.95 | | 112814 | 114114 | 5 |
| 13 | | Invoices | | | | | | | | | | | | |
| 14 | | Customer | Invoice Num | | Debit | Credit | Open Balance | Total Cases | PO Num | Terms | Open Debit | Posted Applied Debit | Open Credit | Posted Applied Credit | Locked |
| 15 | | Default Load Hayward # 1458 | 1065261 | | $0.00 | $0.00 | $0.00 | 0.00 | | OD (Enforce After Sale) | $0.00 | $0.00 | $0.00 | $0.00 | FALSE |
| 16 | | Mollie Stone's Markets/Burlingame Store #6 | 1831-00020 | | $253.61 | $0.00 | $253.61 | 13.00 | | NET 30 | $253.61 | $0.00 | $0.00 | $0.00 | TRUE |
| 17 | | Mollie Stone's Markets/San Mateo #7 # 5224 | 1831-00025 | | $40.54 | $0.00 | $0.00 | 2.00 | | NET 30 | $0.00 | $40.54 | $0.00 | $0.00 | TRUE |
| 18 | | Whole Foods Market #10005 | 1831-00024 | | $190.80 | $0.00 | $0.00 | 10.00 | | NET 30 | $0.00 | $190.80 | $0.00 | $0.00 | TRUE |
| 19 | | Whole Foods Market #10150 | 1831-00022 | | $0.00 | $0.00 | $0.00 | 0.00 | | NET 30 | $0.00 | $0.00 | $0.00 | $0.00 | FALSE |
| 20 | | | 5 | | $484.95 | $0.00 | $0.00 | 25.00 | | | $0.00 | $0.00 | $0.00 | $0.00 | |
| 21 | 117731 | 1/3/2020 | NORCAL SOUTH: HAYWARD, CA | Hammond Mountain View 1 SB Friday | 4787 | Unassigned: Hayward | Verified | Casey Troyer | $0.00 | $746.28 | | 112814 | 114211 | 4 |
| 22 | | Invoices | | | | | | | | | | | | |
| 23 | | Customer | Invoice Num | | Debit | Credit | Open Balance | Total Cases | PO Num | Terms | Open Debit | Posted Applied Debit | Open Credit | Posted Applied Credit | Locked |
| 24 | | Default Load Hayward # 1458 | 1067885 | | $0.00 | $0.00 | $0.00 | 0.00 | | OD (Enforce After Sale) | $0.00 | $0.00 | $0.00 | $0.00 | TRUE |
| 25 | | Whole Foods Market #10155 | 1831-00026 | | $154.56 | $0.00 | $0.00 | 8.00 | | NET 30 | $0.00 | $154.56 | $0.00 | $0.00 | TRUE |
| 26 | | Whole Foods Market #10267 | 1831-00028 | | $113.52 | $0.00 | $0.00 | 6.00 | | NET 30 | $0.00 | $113.52 | $0.00 | $0.00 | TRUE |
| 27 | | Whole Foods Market #10633 | 1831-00027 | | $478.20 | $0.00 | $0.00 | 25.00 | | NET 30 | $0.00 | $478.20 | $0.00 | $0.00 | TRUE |
| 28 | | | 4 | | $746.28 | $0.00 | $0.00 | 39.00 | | | $0.00 | $0.00 | $0.00 | $0.00 | |
| 29 | 117735 | 1/6/2020 | NORCAL SOUTH: HAYWARD, CA | Hammond Mountain View 1 SB Monday | 4787 | Unassigned: Hayward | Verified | Casey Troyer | $0.00 | $894.77 | | 112814 | 113621 | 6 |
| 30 | | Invoices | | | | | | | | | | | | |
| 31 | | Customer | Invoice Num | | Debit | Credit | Open Balance | Total Cases | PO Num | Terms | Open Debit | Posted Applied Debit | Open Credit | Posted Applied Credit | Locked |
| 32 | | Default Load Hayward # 1458 | 1070651 | | $0.00 | $0.00 | $0.00 | 0.00 | | OD (Enforce After Sale) | $0.00 | $0.00 | $0.00 | $0.00 | FALSE |
| 33 | | Draeger's - San Mateo #141769 | 1831-00034 | | $180.80 | $0.00 | $0.00 | 8.00 | | NET 30 | $0.00 | $180.80 | $0.00 | $0.00 | TRUE |
| 34 | | Raley's #628 | 1831-00032 | | $211.65 | $0.00 | $0.00 | 11.00 | | NET 45 | $0.00 | $211.65 | $0.00 | $0.00 | TRUE |
| 35 | | Whole Foods Market #10005 | 1831-00029 | | $154.56 | $0.00 | $0.00 | 8.00 | | NET 30 | $0.00 | $154.56 | $0.00 | $0.00 | TRUE |
| 36 | | Whole Foods Market #10150 | 1831-00031 | | $173.88 | $0.00 | $0.00 | 9.00 | | NET 30 | $0.00 | $173.88 | $0.00 | $0.00 | TRUE |
| 37 | | Whole Foods Market #10154 | 1831-00030 | | $173.88 | $0.00 | $0.00 | 9.00 | | NET 30 | $0.00 | $173.88 | $0.00 | $0.00 | TRUE |
| 38 | | | 6 | | $894.77 | $0.00 | $0.00 | 45.00 | | | $0.00 | $0.00 | $0.00 | $0.00 | |
| 39 | 118099 | 1/7/2020 | NORCAL SOUTH: HAYWARD, CA | Hammond Mountain View 1 SB Tuesday | 4787 | Unassigned: Hayward | Verified | Casey Troyer | $0.00 | $706.32 | | 112814 | 113625 | 9 |
| 40 | | Invoices | | | | | | | | | | | | |
| 41 | | Customer | Invoice Num | | Debit | Credit | Open Balance | Total Cases | PO Num | Terms | Open Debit | Posted Applied Debit | Open Credit | Posted Applied Credit | Locked |
| 42 | | Default Load Hayward # 1458 | 1073498 | | $0.00 | $0.00 | $0.00 | 0.00 | | OD (Enforce After Sale) | $0.00 | $0.00 | $0.00 | $0.00 | FALSE |
| 43 | | Draeger's - Los Altos #141767 | 1831-00044 | | $0.00 | $0.00 | $0.00 | 0.00 | | NET 30 | $0.00 | $0.00 | $0.00 | $0.00 | FALSE |
| 44 | | Mollie Stone's Markets/Burlingame Store #6 | 1831-00040 | | $0.00 | $0.00 | $0.00 | 0.00 | | NET 30 | $0.00 | $0.00 | $0.00 | $0.00 | FALSE |
| 45 | | Raley's #606 | 1831-00043 | | $0.00 | $0.00 | $0.00 | 0.00 | | NET 30 | $0.00 | $0.00 | $0.00 | $0.00 | FALSE |
| 46 | | Raley's #634 | 1831-00041 | | $0.00 | $0.00 | $0.00 | 0.00 | | NET 30 | $0.00 | $0.00 | $0.00 | $0.00 | FALSE |
| 47 | | Raley's #636 | 1831-00042 | | $0.00 | $0.00 | $0.00 | 0.00 | | NET 30 | $0.00 | $0.00 | $0.00 | $0.00 | FALSE |
| 48 | | Whole Foods Market #10155 | 1831-00038 | | $262.08 | $0.00 | $0.00 | 14.00 | | NET 30 | $0.00 | $262.08 | $0.00 | $0.00 | TRUE |
| 49 | | Whole Foods Market #10267 | 1831-00036 | | $214.08 | $0.00 | $0.00 | 11.00 | | NET 30 | $0.00 | $214.08 | $0.00 | $0.00 | TRUE |
| 50 | | Whole Foods Market #10633 | 1831-00037 | | $230.16 | $0.00 | $0.00 | 12.00 | | NET 30 | $0.00 | $230.16 | $0.00 | $0.00 | TRUE |
| 51 | | | 9 | | $706.32 | $0.00 | $0.00 | 37.00 | | | $0.00 | $0.00 | $0.00 | $0.00 | |

O'Neill Exhibit 23 (3-4-21)

This spreadsheet shows more detailed information about the same invoices including the customer associated with each invoice. The load sheet identification numbers in column A and the invoice numbers in column C correspond with the sheet above, allowing the information from the two tables to be related.